## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

**TONYA NEWBERRY**                                                    **PLAINTIFF**

**VS.**                        **No. 3:19-cv-00192 PSH**

**ANDREW SAUL,  Commissioner,**
    **Social Security Administration**                        **DEFENDANT**

## ORDER

Plaintiff Tonya Newberry ("Newberry")  appeals the final decision of the Commissioner of the Social Security Administration (defendant "Saul") denying her claim for Disability Insurance benefits (DIB) and supplemental security income (SSI). She contends the Administrative Law Judge ("ALJ") erred in the following four ways when  assessing Newberry's residual functional capacity ("RFC"): (a) in determining Newberry could perform the walking and standing required for light work; (b)  in finding Newberry could constantly use her left hand and frequently use her right hand to work 8-hour days; (c) in failing to find mental limitations noted by the only medical opinion evidence in the record; and (d) in failing to support the erroneous residual functional capacity ("RFC") findings with any medical opinion from a medical source

that examined Newberry.   Newberry also contends the ALJ erred by failing to adequately develop the record, by relying upon legally deficient vocational evidence at Step 5, and by failing to get a "reasonable explanation" from the vocational expert for testimony that was inconsistent with the *Dictionary of Occupational Titles ("DOT")*.   The parties have ably summarized the medical records and the testimony given at the administrative hearing conducted on August 28, 2018.   (Tr. 73-97).   The Court has carefully reviewed the record to determine whether there is substantial evidence in the administrative record to support Saul's decision.   42 U.S.C. § 405(g). The relevant period under consideration is from June 15, 2015, the date of alleged onset, through January 7, 2019, when the ALJ ruled against Newberry.

### The Administrative Hearing:

At the August 16, 2018 hearing, Newberry was 50 years old with an eleventh grade education.   Newberry obtained a GED and received additional training in working with mentally challenged individuals.   Newberry lived alone, and was working part-time (16 to 20 hours a week) at Kroger.   Her shifts at Kroger were typically five hour stints, and she was on her feet during the shift except for a ten minute break and a few odd moments.   Newberry indicated she had been working at Kroger since June of 2017 (about fourteen months), and also worked at Friendship Community Care for two months while working at Kroger.   Her job at Kroger was as

2

a backup cashier and sometime bagger.  Newberry stated she lifts only with her left arm due to poor grip and pain in her right arm, and estimated she could not perform full time work at Kroger.  She explained she was right handed and the pain in her right arm radiated into her neck.

Newberry stated she could not perform full time work due to a combination of mental and physical impairments.  Her "whole body aches" and she has left leg problems, loss of mobility in her right arm, random swelling of her face and limbs, parts of her body turn purple, fatigue, high anxiety, chronic pain, and severe post traumatic stress disorder.  (Tr. 80).

Newberry identified her treating physicians as Dr. Amy Johnson and Dr. Difine.  She also indicated she was recently seen by Dr. Dow, who referred her to be seen by a rheumatologist and a neurologist.  Newberry had also been seen by Dr. Savu, a pain specialist.  A nerve conduction study had been performed to determine if she had carpal tunnel syndrome, but the results were not available at the time of the hearing.  Newberry also stated she was to be seen in October to determine if she had lupus.

Newberry listed her current medications as Paxil, Trazodone, a high blood pressure medication, Prednisone, Norco, and vitamin D-12.  The Prednisone provided "a little bit maybe" of improvement, and the pain medication, cortisone, and steroids gave temporary relief.  One of her physicians suggested in-home therapy but

Newberry found this to worsen her problems.  (Tr. 75-91).

Elizabeth Clem ("Clem"), a vocational expert, testified.  The ALJ posed a hypothetical question to Clem, asking her to assume a worker of Newberry's age, education, and experience, who could perform light work, but could only occasionally stoop, kneel, crouch, or crawl, only occasionally work overhead, use her right upper extremity frequently but not constantly for fingering or feeling, have occasional contact with the general public, and tolerate occasional changes in a routine work setting, with simple, direct, and concrete supervision.  Clem testified that such a worker could not perform Newberry's past relevant work as a retail sales clerk.  Clem testified that such a worker could work as a housekeeper or a machine operator.  (Tr. 90-97).

*ALJ's Decision:*

In his January 7, 2019, decision, the ALJ determined Newberry had not engaged in substantial gainful activity since June 15, 2015, the alleged onset date. Severe impairments found by the ALJ were degenerative disc disease, carpal tunnel syndrome, osteoarthritis, hypertension, obesity, post traumatic stress disorder, depression, and anxiety.  The ALJ noted Newberry's allegations that she suffered from lupus, obsessive-compulsive disorder, and seizures, but found those impairments were not medically determinable as defined in the Social Security regulations.  The

ALJ found Newberry did not meet any Listing, and he explicitly addressed Listings 1.02, 1.04, 4.00H, 12.04, 12.06, and 12.15. The ALJ considered the "paragraph B" criteria regarding mental impairments, finding Newberry had a mild limitation in understanding, remembering, or applying information, a moderate limitation in interacting with others, a moderate limitation in concentrating, persisting, or maintaining pace, and a mild limitation in adapting or managing oneself.

The ALJ found that Newberry had the RFC to perform light work with restrictions which mirrored those contained in the hypothetical question posed to Clem. This RFC formulation was based, in part, upon the ALJ's determination that Newberry's subjective statements were "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 40). The ALJ thoroughly reviewed the medical evidence by both treating and non-examining physicians. He specifically noted the absence of medically imposed limitations and the presence of consistently conservative treatment. The ALJ also cited Newberry's daily activities, including her ability to hold a part-time job. Relying upon Clem's testimony, the ALJ determined Newberry was not capable of performing her past relevant work but was able to perform housekeeping and machine operator jobs. Therefore, the ALJ concluded Newberry was not disabled. (Tr. 33-48).

### *Medical Evidence of Physical Impairments During the Relevant Period:*

In October 2015, Newberry sought emergency treatment for lumbar and bilateral knee pain. She was diagnosed with acute low back pain and bilateral knee pain and received pain medication. (Tr. 453-455). Later that month, knee imaging reflected mild degenerative disease. (Tr. 451).

In May 2016, Newberry was treated by Dr. Terry Hunt ("Hunt") for right side pain and weakness, tingling in her hands and feet, and chronic depression. She was assessed with limb pain, peripheral neuropathy, depression with anxiety, and headache. (Tr. 471).

In late June 2016, Newberry saw Dr. William Palmer ("Palmer"), stating she had been losing mobility since June 2015 and was experiencing bad neck pain, numbness in arms/hands, was light headed and sick to her stomach, and had tingling in her fingers on right hand and headaches. Palmer referred her to a neurologist, and instructed her to go to the emergency room if symptoms worsen. (Tr. 898-900). Newberry returned to Palmer on August 3, 2016 for worsening back and right shoulder pain. (Tr. 893).

On August 9, 2016, Newberry went to the emergency room complaining of blurred vision. She was examined and given Zofran. Noting that her symptoms had improved and that she verbalized she would keep her appointment with a neurologist, Newberry was discharged. The final diagnosis was an episode of generalized

weakness, multiple neurological symptoms, and other chronic pain. (Tr. 523-536).

Newberry returned to Palmer the next day for follow up on muscle spasms. Palmer diagnosed her with muscle pain, depression, and heat intolerance. (Tr. 889-891). The following day, August 11, 2016, a nerve study test of the upper extremities was performed at Palmer's request. The tests showed Newberry to have moderately severe carpal tunnel syndrome ("CTS") of the right and left upper extremities. (Tr. 921).

Newberry saw neurologist John Campbell ("Campbell") on August 17, 2016, for neck pain, joint pain and stiffness, right arm and shoulder pain, and numbness and tingling. Campbell noted a recent MRI of the cervical spine showed some disk spur complexes at C4-5 and C5-6 causing mild neural foraminal and mild canal stenosis, as well as a bulging disk on the right at T2-3 resulting in some slight right neural foraminal narrowing. Campbell assessed Newberry's strength at 5/5 in both upper extremities, and noted her strength improved with coaching. Campbell recommended physical therapy. (Tr. 542).

Newberry presented as a new patient to primary care physician Roger Cagle ("Cagle") on August 17, 2016, complaining that Palmer was not treating her symptoms, and indicating concern that she might have lupus. Cagle examined her and found no spinal tenderness and no clubbing or edema in her extremities. Cagle

assessed Newberry with cervicalgia, hypertension, muscle weakness, pain in right shoulder, abnormal findings on diagnostic imaging of other specified body structures, dysuria, and occlusion and stenosis of left carotid artery.  (Tr. 1172-1179).

Newberry was transported by ambulance to the emergency room on August 30, 2016.  She was found in her living room on the floor.  She told medical personnel she had been moving boxes all morning and had not eaten.  The living room had no air conditioning.  The emergency room physician noted Newberry may have gotten too hot, combined with taking hydrocodone and not eating.  Newberry was instructed to return if symptoms worsened.  It was also noted that the blood tests showed mild muscle breakdown with no signs of dehydration and the lumbar spine x-ray showed a possible broken bone  (Tr. 992-1000).

Newberry followed up after the emergency room visit by seeing Cagle on September 1, 2016.  Cagle added heat exhaustion and syncope to the list of assessments he had diagnosed on August 17, and Newberry was instructed to return in a month. (Tr. 1170-1173).

In late September 2016, Newberry was referred by Palmer to see orthopedic specialist Spence Guinn ("Guinn") for bilateral wrist problems. Following the examination, Guinn recorded that Newberry "has severe pain even with light touch throughout the neck and arm.  She has severe pain with even very gentle ROM.  With

distraction testing, there was no obvious compression test in her wrists." (Tr. 546). Guinn recommended a referral to an orthopedic spine surgeon. (Tr. 545-547).

In November 2016, Newberry was examined by orthopedic surgeon Edward Saer ("Saer"). Saer found her gait normal, her cervical spine nontender, with good range of motion and no pain, her shoulder range of motion good and not painful, and her upper extremity deep tendon reflexes equal and upper extremity strength intact. Saer assessed her with cervical disc syndrome, stating that "[s]he does not appear to have a disc herniation on her MRI. Her symptoms certainly sound like she was having radiculopathy at the onset. She is improving and hopefully will continue to do so." (Tr. 552). Saer prescribed physical therapy and Naproxen, and scheduled her to return in six weeks. (Tr. 549-555).

In May 2017, Newberry returned to Palmer for follow up on neck pain. Palmer diagnosed empty sella[1] and neck pain, and ordered an MRI of her head and a physical therapy consultation. (Tr. 883-885). On May 11, 2017, Newberry was seen by physical therapist Ross Westbrook ("Westbrook"), who outlined a plan to reduce the pain during nine visits over twenty-four days. Newberry was seen by Westbrook on May 11 and 16, but Newberry cancelled the treatment on May 12 and 15, and did not

---

[1] Newberry does not allege disability based upon empty sella syndrome, a rare condition which does not affect overall health. *See* https://www.webmd.com/brain/empty-sella-syndrome-facts.

9

appear as scheduled on May 17, 18, and 31.  She was discharged secondary to lack of attendance.  (Tr. 1148-1163).

On referral from Palmer, Newberry was seen as a new patient by APRN Amber Sloan ("Sloan") at the Northeast Arkansas Pain Medicine clinic on June 15, 2017. Newberry reported her chief complaint to be neck pain.  Sloan's examination noted normal range of motion of the lower and upper extremities, pain throughout the cervical spine, with decreased extension, pain throughout the lumbar spine, with decreased sidebending, decreased flexion and extension, and negative testing for cervical spine compression.  Newberry showed normal range of motion in the thoracic spine, but decreased range of motion in the lumbar spine, and pain with extension and flexion.  Sloan prescribed opioid analgesics and recommended a cervical steroid injection and diagnostic medical branch blocks.  (Tr. 1511-1515).

On July 25, 2017,  Newberry was seen by Dr. Calin Savu ("Savu") at The Pain Center.  Savu performed a right cervical medial branch block.  She was instructed to keep a pain diary for the ensuing six hours and report back to Savu the next day.  (Tr. 1517).  On August 18, Savu performed a right confirmatory cervical branch block, and Newberry received the same instructions as with the July 25 procedure.  (Tr. 1519-1520).

On September 19, 2017, Newberry saw Palmer at a follow up visit after the

blocks performed by Savu. She indicated she still had hand pain/stiffness. She stated she took some Alleve which provided some relief, and she "has been out of the muscle relaxer and has felt she hasn't needed it. Only issue is occ. right arm spasm during her work, and it will go numb at times." (Tr. 1476). Palmer recorded Newberry was more alert and seemed to be on a better regimen. (Tr. 1476-1477).

Newberry returned to Savu in October 2017, and he performed a right cervical radio-frequency neurolysis at C3-C4 and C4-C5. (Tr. 1521-1522).

Newberry returned to Palmer on November 2, 2017 complaining of muscle spasms and of occasions where she would "freeze up." (Tr. 1621). Palmer diagnosed neck pain and syncope and ordered an EKG and an EEG. (Tr. 1621-1623).

In April of 2018, Newberry presented as a new patient to Dr. John Dow ("Dow"). Her chief complaints were hypertension, swelling, and possible positive antinuclear antibody ("ANA"). Dow examined Newberry, noting no spinal tenderness, no tenderness to palpation, and normal range of motion in her right and left upper and lower extremities. (Tr. 1615-1620). She returned to Dow on May 22, 2018, stating that the medication she was given "has worked great." (Tr. 1607). She did complain, however, of tingling in her legs and arms all night long. Dow's examination was unremarkable, and he assessed her with empty sella, muscle pain, obesity, insomnia, joint pain, tobacco use, hypertension, and anxiety. (Tr. 1607-

1610).

On June 11, 2018, Newberry met with Dow to discuss pain management and the possibility of obtaining a handicap placard. Dow found she did not qualify for a handicap placard. He noted that she quit one of her two jobs. His examination of her neck and upper and lower extremities was virtually unremarkable. Dow assessed her with empty sella, exhaustion, joint stiffness, muscle pain, neck pain, obesity, depression, joint pain, hypertension, and anxiety. (Tr. 1603-1605).

On Dow's referral, Newberry was seen by Dr. Terry Kosinski ("Kosinski") on June 30, 2018, where she complained of right thumb pain radiating down the arm and right thumb swelling. Kosinski's examination found good range of motion with normal muscle strength and motor tune on Newberry's upper and lower extremities, and a positive Tinel sign, right hand, with pain, numbness, and tingling. An x-ray of the right hand was negative. Kosinski assessed her with CTS right hand, arthritis, and paresthesia, and ordered a new nerve conduction study. (Tr. 1716-1720).

On July 19, 2018, Newberry was seen by Dr. Amy Johnson ("Johnson") for a new patient examination. Newberry complained of chronic pain, long term drug therapy, depression, and anxiety. Johnson's examination showed Newberry's neck, left knee, lumbar spine, and cervical spine were tender, and the left knee was limited in range of motion. (Tr. 1650-1656).

The new nerve study ordered by Kosinski was performed on August 7, 2018. The conclusions were moderately severe right CTS; normal right ulnar, radial, and axillary nerves; and no radiculopathy, myopathy, or myositis of the right upper extremity. (T. 1727).

### *Medical Evidence of Mental Impairments During the Relevant Period:*

On July 14, 2015, Newberry arrived at the emergency room via ambulance complaining of an anxiety attack, chest pain, and arm numbness and tingling. She was noted to be anxious, tearful, non-suicidal, and angry and yelling at her brother. She was diagnosed with chest pain and situational anxiety, and the medical personnel recorded that Newberry's stress was tied to frustrations dealing with caring for her father, who had dementia. She was given Ativan and discharged. (Tr. Tr. 458-461).

In July 2016, Newberry was seen at Families, Inc., for depression. She reported many symptoms of depression, anxiety, and obsessive compulsive behavior. She was diagnosed with generalized anxiety disorder and with major depressive disorder, recurrent episode, moderate. Goals were identified and a treatment plan emphasizing individual therapy was devised to address these issues. She was also prescribed Klonopin, Paxil, and Trazodone. (Tr. 801-819). Newberry continued sessions at Families, Inc., in August (three sessions), September (three sessions), November (two sessions), December (one session), January 2017 (three sessions), and February 2017

(three sessions).  During these sessions, Newberry reported her struggles as well as the progress she was making.  (Tr. 820-864).

In March 2017, Newberry was seen for a Psychological Testing Report by Dr. Mark Cates ("Cates").  Cates diagnosed PTSD, generalized anxiety disorder, and major depressive disorder, and recommended she continue treatment at Families, Inc. (Tr. 1185-1189).

Newberry regularly attended individual therapy sessions at Families, Inc., from April 2017 through June 2018.[2]  She did not meet the stated goals of reducing anxiety and panic symptoms and improving her mood stability to a functional level.  (Tr. 1437-1714).

The Court now turns to Newberry's claims for relief.

***ALJ error in determining Newberry's RFC – (a) error in finding she could perform the walking and standing required for light work.***

It "is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations." *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).

---

[2] Newberry was a patient at Families, Inc., for five years prior to the relevant period for disability purposes, beginning counseling there in October 2010.  (Tr. 556-802, 1190-1372).

Newberry claims the ALJ erred in finding she could perform the walking and standing required for light work without reliance upon a medical opinion from an examining physician.  It is true that there is no single opinion mirroring the ALJ's RFC conclusions regarding Newberry's ability to walk and stand.  While such an opinion may have been useful, one was not required.  *See Hensley v. Colvin*, 829 F.3d 926 (8th Cir. 2016) (no requirement that an RFC finding be supported by a specific medical opinion).  In addition, Newberry does not cite an opinion from any of her numerous medical providers indicating she was unable to perform the walking and standing required for a limited range of light work.  Medical records from treating physicians can provide affirmative medical evidence supporting an RFC determination.  *Johnson v. Astrue*, 628 F.3d 991 (8th Cir. 2011).  Here, Newberry was treated and/or evaluated by numerous medical personnel during the relevant period.  The ALJ was not obligated to choose one of the treating or non-treating sources[3] and fully embrace the opinion of that source.  To do so ignores the ALJ's duty to examine all of the relevant evidence.  The ALJ acknowledged the medical evidence, including imaging results, which showed that Newberry had musculoskeletal impairments.

---

[3] For example, the non-examining state agency physicians opined Newberry could perform the full range of light work.  The ALJ rejected this opinion, in part, by finding she could perform some light work with restrictions.  The ALJ is empowered and encouraged to make such findings, and is not required to choose a single opinion and embrace that opinion to the exclusion of the remaining medical evidence.

Specialists Campbell, Guinn, and Saer examined Newberry and treated her with physical therapy and Naproxen. The ALJ found these musculoskeletal impairments would limit Newberry's ability to stoop, kneel, crouch, or crawl, and the ALJ's RFC incorporated corresponding limitations. The ALJ also thoroughly addressed the findings of treating medical providers Palmer, Sloan, and Dow regarding these limitations. The absence of a single medical opinion matching the ALJ's standing and walking RFC is not erroneous, and there is no merit to this claim.

***ALJ error in determining Newberry's RFC – (b) error in finding she could constantly use her left hand and frequently use her right hand to work 8-hour days.***

Newberry faults the ALJ's findings regarding manipulative limitations, contending the ALJ based his finding on a single clinical note from September 2017. This note, authored by treating physician Palmer, assessed Newberry with grip strength of 4/5 in her right hand. Palmer observed "some poor effort" on Newberry's part. (Tr. 1476). The ALJ's citation of Palmer's September 2017 entry was not, however, the only discussion of Newberry's hand issues. The ALJ acknowledged that nerve conduction studies showed Newberry to have moderately severe CTS, and a June 2018 examination showed a positive Tinel's sign in Newberry's right hand. The ALJ also cited Campbell's finding of strength of 5/5 in both upper extremities and no sensory loss, Saer's finding of symmetric upper extremities with no atrophy and equal

16

reflexes, APRN Sloan's notation that Newberry stated she needed assistance getting in or out of bed or a chair but was able to transfer from sitting position to an exam table without difficulty, and Dow's exam showing normal range of motion in upper extremities and normal muscle strength.  (Tr. 41-42).  The ALJ also noted that conservative treatment was the recommended course for Newberry, and that prescribed physical therapy was discontinued when Newberry attended only two of the scheduled sessions.  In summary, the ALJ relied upon relevant evidence, both medical and otherwise, to determine Newberry's manipulative limitations, and he did not err by basing his decision on a single clinical note.

### *ALJ error in determining Newberry's RFC – (c) error in failing to find mental limitations noted by the only medical opinion evidence in the record.*

Newberry contends the ALJ disregarded the treating mental health specialists' opinions and erred in failing to include RFC provisions for her mental impairments. The ALJ's opinion included the following:

> . . . the medical records show a history of treatment for anxiety, depression and, recently, posttraumatic stress disorder (PTSD). However, as a threshold matter, the undersigned is cognizant of the overlap in symptomology between different mental impairments, as well as the inherently subjective nature of mental diagnoses. Accordingly, the undersigned has considered the claimant's psychological symptoms and their effect on functioning together, instead of separately, regardless of the diagnostic label attached.
>
> Throughout the adjudicatory period, the claimant has attended individual

17

therapy on a regular basis, where she has frequently appeared tearful and reported experiencing crying spells, panic attacks, social isolation due to social anxiety, and hopelessness and worthlessness. She has also reported self-mutilation. Mental health providers have noted the claimant to appear with a depressed or dysthymic mood; an anxious mood; and an irritable mood. Her treating providers have continuously recommended she receive individual therapy two to four times per month, and she is treated with antianxiety and antidepressant psychotropic medications. At psychological testing on March 9, 2017, by Mark Cates, Ph.D., Dr. Cates noted high levels of both anxiety and depression and recommended treatment to address symptoms of posttraumatic stress disorder. In May 2017, the claimant alleged she lost a part-time job because of having to leave work early from crying spells and other mental health concerns.

As a result of this evidence, the undersigned finds that the claimant is limited to only occasional contact with the general public, can tolerate only occasional changes in a routine work setting, and requires supervision that is simple, direct, and concrete.

That said, the record as a whole does not support additional limitations. At the time she lost one part-time job allegedly due to mental health concerns, the claimant expressed that her medication has been effective for anxiety, and she does not always need to take full dosage and frequency. Later that year, the claimant reported to her primary care provider that she was feeling emotionally better due to medications prescribed by her psychiatrist, and she only needed to take Xanax once a day or every other day. In April 2018, she reported using Xanax about once daily, which was half the prescribed dose. In June 2018, she expressed that her antianxiety medications have allowed her to continue working.

(Tr. 43-44) (citations omitted).

The ALJ then detailed Newberry's activities of daily living, including her continued part-time job in a supermarket, where she worked around coworkers and

the public.  The ALJ also reviewed the opinions of the state agency psychological consultants, who opined Newberry was mildly limited in the areas of understanding, remember, or applying information and in adapting or managing oneself, and moderately limited in interacting with others and in concentrating, persisting, or maintaining pace.  The state consultants specifically opined Newberry to be capable of performing work "where interpersonal contact is incidental to work performed, e.g., assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete."  (Tr. 117).

The above-cited record reflects that the ALJ did not ignore or disregard the mental health treatment received by Newberry.  To the contrary, the ALJ addressed her mental impairments and included limitations in her RFC related to them.  These limitations mirror the restrictions of the state agency consultants.  Substantial evidence supports the ALJ's treatment of Newberry's mental impairments.  Her daily activities, including her ability to maintain a part-time job interacting with the public, and the absence of any greater limitations imposed by her treating mental health providers, are two particularly persuasive factors supporting the ALJ's decision.

***ALJ error in determining Newberry's RFC – (d) error in failing to support the erroneous RFC findings with any medical opinion from any medical source that examined Newberry even once.***

This argument was made and addressed as part of Newberry's claim in part (a). The ALJ did not err in this regard. *See Hensley v. Colvin*, 829 F.3d 926 (8th Cir. 2016) (no requirement that an RFC finding be supported by a specific medical opinion).

To summarize Newberry's various challenges to the RFC determination, the Court is mindful that reversal of the ALJ is not appropriate "so long as the ALJ's decision falls within the 'available zone of choice.' " *Bradley v. Astrue,* 528 F.3d 1113, 1115 (8th Cir.2008) (quoting *Nicola v. Astrue,* 480 F.3d 885, 886 (8th Cir.2007)). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola,* 480 F.3d at 886). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart,* 421 F.3d 785, 789 (8th Cir.2005). Here, the ALJ's RFC conclusion is supported by substantial evidence and falls squarely within the zone of choice.

### *ALJ error in failing to adequately develop the record.*

Even though Newberry is correct that the ALJ has a duty to fully and fairly develop the record, she fails to demonstrate how the record, which appears to contain

all treatment records during the relevant period, was inadequate and how additional reports would cure the inadequacy.   Newberry is correct that the medical records mention a possible referral to see a rheumatologist.   This mention, by Palmer in 2017 and Dow in 2018, does not mandate that the ALJ order a consultative examination. The objective medical evidence in this case was ample and the ALJ's decision was well-informed.  *See Martise v. Astrue*, 641 F.3d 909, 926-27 (8th Cir. 2011) (ALJ not required to order additional medical exams unless the existing medical record is insufficient).   At the administrative hearing, Newberry's counsel informed the ALJ there were no objections or additions to the existing record.  (Tr. 76).   While the ALJ has an obligation to fully develop the record, there is no bright line test for determining whether he has done so; the determination is made on a case by case basis.  *See Battles v. Shalala*, 36 F.3d 43 (8th Cir. 1994).   The key is whether the record provides the ALJ with ample information to allow an informed decision to be made.   Here, the medical evidence is voluminous.   Newberry, who bears the burden of demonstrating her disability, does not show that the ALJ erred in relying upon the record before him.

***ALJ error in relying upon legally deficient vocational evidence at Step 5.***

Newberry faults the ALJ's interaction with Clem, the vocational expert, at Step 5, where the ALJ carries the burden of demonstrating a claimant can perform work in

the national economy.

First, Newberry contends the hypothetical question posed by the ALJ to Clem was deficient "because the ALJ did not rely on any treating or examining medical opinions addressing functional limitations when forming the vocational hypothetical" and the "ALJ really relied on his own medical opinions."  Docket entry no. 14, page 31.  Newberry has already argued that the ALJ failed to rely upon treating or examining sources, that he failed to endorse a single opinion offered by a treating or examining source, and that the ALJ substituted his own medical opinion instead of performing a proper RFC analysis.  These arguments are without merit.  To be clear, the ALJ considered the numerous treating and examining sources in reaching his RFC conclusion.  The RFC conclusion is supported by substantial evidence.  So, a challenge to the hypothetical question is actually another challenge to the RFC.  There is no merit to this claim.

Newberry next claims error on grounds that the ALJ's RFC and hypothetical question failed to account for her moderate limitations in the ability to concentrate, persist, or maintain pace.[4]  The RFC determination included the following restrictions: work with "only occasional contact with the general public; can tolerate occasional

---

[4] At Step 3, the ALJ found moderate limitations in concentration, persistence, and pace.

changes in a routine work setting; and is limited to work where the required supervision is simple, direct, and concrete." (Tr. 39).  The Court finds that the ALJ's RFC determination adequately takes into account Newberry's moderate limitations in concentration, persistence, and pace.

Each step of the sequential evaluation process serves a distinct purpose, "the degrees of precision required at each step differ," and the deferential standard of review precludes the Court from labeling findings as inconsistent if they can be harmonized. *See Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018) [citing *Lacroix v. Berryhill*, 465 F.3d 881, 888 n.3 (8th Cir. 2006) ("Each step in the disability determination entails a separate analysis and legal standard.")].

Citing *Newton v. Chater*, 92 F.3d 688 (8th Cir. 1996),[5] and *Brachtel v. Apfel*, 132 F.3d 417 (8th Cir. 1997), Newberry argues that the hypothetical question posed to Clem was inadequate, as it should have included a specific limitation for concentration, persistence, and pace or, in the alternative, more specific limiting language, such as describing the work as not requiring close attention to detail, the

---

[5] In *Newton*, there was no dispute that the claimant suffered from deficits in concentration, persistence, or pace, with the ALJ noting that the claimant "often" suffered from these limitations.  Unlike the present case, the ALJ's hypothetical in *Newton* limited the worker to "simple jobs" with no further elaboration.  92 F.3d at 695.

phrase used in *Brachtel*.   Newberry acknowledges, however, that *Berry v. Berryhill*, No. 3:17cv245 PSH (E.D. Ark. Jul. 11, 2018), recognized that an ALJ's findings at Step 3 are not the same as an RFC assessment.

The Court finds that the ALJ's hypothetical question adequately captured the consequences of Newberry's deficiencies of concentration, persistence, and pace.   The reasoning and result in *Berry* apply here.   Newberry attempts to distinguish *Berry,* stating that the ALJ here "specifically found the same limitations [as in Step 3] when making RFC findings."   Docket entry no. 14, page 34.   The Court disagrees.   The RFC, as previously cited, does not contain the Step 3 limitations.   The mere mention by the ALJ of the state agency psychological consultants' findings of  moderate limitations is not an inclusion of these findings in the RFC.   To be precise, the ALJ wrote that Newberry had "some, *but not more than moderate*," limitations in her ability to concentrate, persist, and maintain pace.   (Tr. 45).   Thus, in his RFC discussion, he assessed the limitations as moderate or less.

Another reason supports the ALJ's hypothetical question.   As in *Berry*, the ALJ here cited the claimant's activities of daily living in reaching his RFC conclusion.   In particular, Newberry's ability to maintain part-time employment where she worked five hour shifts with only a ten minute break shows some ability to concentrate and persist.

Under these circumstances, the Court finds the ALJ had no obligation to explicitly include the Step 3 limitations noted in the hypothetical question posed to Clem.  Newberry's daily activities support the ALJ's treatment of the limitations, and the hypothetical question adequately captured her abilities.

***ALJ error by failing to get a "reasonable explanation" from the vocational expert for testimony that was inconsistent with the DOT.***

Clem identified housekeeping and machine operator as jobs which Newberry could perform.  She elaborated – "the hypothetical does allow for occasional overhead reach that directional reaching is not set forth in the DOT.  So my testimony regarding that part of the hypothetical has come from – is coming from job shadowing and job experience."  (Tr. 95).

The parties agree that the DOT indicates that both jobs identified by Clem require frequent reaching.  The parties further agree that when, as in this instance, there is a conflict between the vocational expert's testimony and the DOT, it falls upon the expert and the ALJ to provide a "reasonable explanation" for the apparent conflict.  *Moore v. Colvin*, 769 F.3d 987 (8th Cir. 2014).

The sole issue is whether Clem's testimony amounts to a "reasonable explanation" for the apparent conflict.   Newberry notes that a vocational expert

answering only "yes" to a question asking if her testimony is consistent with the DOT does not amount to a "reasonable explanation." *Id. at 989-990.* The answer of "that's based on my experience" was also found not to be a "reasonable explanation." *See Montoya v. Social Security Administration*, No. 3:18cv91 JTK (E.D. Ark. June 13, 2019). Newberry also cites *Pugh v. Colvin*, No. 4:14cv397 BD (E.D. Ark. June 11, 2015), a case where the vocational expert did not provide an explanation, and the record did not reflect whether the expert or the ALJ even recognized that a conflict existed. Finally, Newberry cites *Burfield v. Colvin*, No. 4:14cv161 SWW/JJV (E.D. Ark. July 15, 2015) as an example of a vocational expert providing an acceptable "reasonable explanation." In *Burfield*, the expert testified the claimant could perform the work of fishing float assembler by modifying the process typically used and holding the product between the worker's knees during assembly.

The *Burfield* case is an excellent example of detailed testimony by a vocational expert explaining the apparent conflict between the DOT and the expert's testimony, and vocational experts would be well advised to provide such a thorough explanation. However, the question remains whether Clem's testimony provided a "reasonable explanation" in this case, and the Court believes that it was. She did not rely solely on her past experience, even though her experience dated back to 1999. (Tr. 441-442). Instead, she also explained that "job shadowing" informed her on the issue. (Tr.

95).  Job shadowing suggests on-site observation of the performance of the jobs.

Clem's knowledge based on job shadowing is significant, and coupled with her

experience, is a "reasonable explanation" to resolve the conflict.  The Court is mindful

that experts are called to testify precisely because of their expertise, and an ALJ can

fairly rely upon an expert who has personally shadowed a particular job or jobs.[6]

In summary, substantial evidence supports the determinations reached by the

ALJ.  The Court is mindful that its task is not to review the record and arrive at an

independent decision, nor is it to reverse if it finds some evidence to support a

different conclusion.  The test is whether substantial evidence supports the ALJ's

decision.  *See, e.g., Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012).  This test is

satisfied in this case.

IT IS THEREFORE ORDERED that the final decision of Saul is affirmed and

Newberry's complaint is dismissed with prejudice.

IT IS SO ORDERED this 6th day of May, 2020.



UNITED STATES MAGISTRATE JUDGE

---

[6] And while Clem's testimony did provide a "reasonable explanation" in this matter, additional testimony about such job shadowing when explaining apparent conflicts would have been helpful to the Court.